**Tom S. Neuman, M.D., FACP, FACPM, FUHM**
**579 Amphitheater Drive**
**Del Mar, California 92014**
**858-755-0795**

July 5, 2018

Mr. Leonard Levenson
Leonard L. Levenson & Associates
424 Gravier Street, 1st Floor
New Orleans, Louisiana 70130

Mr. Levenson:

I have reviewed the records you have forwarded to me. In accordance with your request, I am providing my opinions concerning what role, if any, asphyxiation (i.e. "positional asphyxia," "compressive asphyxia," or "restraint asphyxia") may have played in the death of Mr. Joseph. Additionally you have asked me to comment upon some statements made in Dr. Baden's report and in the deposition transcript of Dr. Esserman

The documents I have reviewed thus far are:
1. Police Report by Jeffrey Laborie
2. Police Report by Kayla Blanchard
3. Police Report by John Normand
4. Police Report by Scott Zemlik
5. Police Report by Jace Pellegrin
6. Taser Review Board Report, Taser Discharge Interview/Review, and Taser Deployment Report
7. Medical Records of Kendole Joseph (obtained presuit)
8. Jefferson Parish Coroner's Office Autopsy Report
9. EMS Report for February 7, 2017 incident
10. EMS Reports for June 28, 2016 incidents
11. Police Report for June 28, 2016 incident
12. Original Complaint filed in the USDC – EDLA
13. First Amended Complaint filed in the USDC – EDLA
14. Taser Video
15. Convenience Store video
16. Wal-Mart video
17. Save-a-Dollar Video
18. Photographs of Kendole Joseph Prescription bottles
19. Neuropathology Consultation Report of Zhenggang Xiong, MD, PhD

**EXHIBIT D**

20. Cardiovascular Consultation Report by Jesse E. Edwards Registry of
    Cardiovascular Disease – Emily R. Duncanson, MD
21. Deposition Testimony of Dr. Marianna Eserman
22. Expert of Michael M. Baden, MD
23. Officer & Witness Statements by: Sharon Walker and
24.       Valerie Mendez
25.       Rayshad Rogers
26.       Shana Marek
27.       D'Amica George
28.       Keith Hunter
29.       Eddie Martin
30.       Robert Faison
31.       Damond Bartlett
32.       Clarence Winbush
33.       Kayla Ranatza
34.       Shannon Dugas
35.       Jennifer Stanley
36.       Oliver Selvey
37.       Thomas Tompson
38.       John (Taylor) Normand
39.       Arthur Morvant
40.       Steven Verrett
41.       Julius Rolland
42.       Dustin Vinet
43.       Angela Varisco
44.       Brandon LeDuff
45.       James Price
46.       Duston Costa

I believe I have the appropriate experience and knowledge to provide you
with these opinions as I am one of only a handful of physicians and the only
physician specifically trained in pulmonary medicine and exercise
physiology in the United States who has, through direct experimentation,
investigated the physiologic effects of restraint positions and their effects
upon ventilation, cardiac output, carbon dioxide levels, and blood oxygen
levels. The information I am providing you is based upon my own research
in this field as well as the publications of other individuals who have
conducted experiments utilizing recognized procedures and objective end
points. These materials have been published in peer-reviewed journals and
all of the pertinent references to my publications can be found on my
curriculum vitae (attached) and other references are found in the reference
lists of the above publications (some of which could, as necessary, be used
as exhibits). I have also attached a list of cases in which I have provided
testimony in the last 4 years as well as my fee schedule.

As background, I am a physician licensed to practice medicine in the State of California.  I was a full time member of the faculty of the University of California San Diego until July 1, 2006. Until that time, I was a Professor of Medicine and Surgery at UCSD and the Associate Director of the Department of Emergency Medicine.  As of that date, I partially retired and now hold the position of Emeritus Professor of Medicine. I am active in ongoing research in the field of asphyxia associated deaths (i.e. positional axsphyxiation/restraint aspyxiation, drowning). I am Board Certified in Internal Medicine, Pulmonary Disease, Occupational Medicine, and Undersea and Hyperbaric Medicine.  Until January 1, 2017, I was also board certified in Emergency Medicine, however at that time I allowed my Emergency Medicine certification to lapse. These are all specialties recognized by the American Board of Medical Specialties. I do not feel it is necessary for me to further describe my activities and achievements as they are fully described in my curriculum vitae.

Based upon the above material, the more important facts appear to be:

1. Following a period of agitated and potentially delirious behavior, Mr. Joseph became involved in an altercation with police officers
2. Mr. Joseph had a history of schizophrenia and was apparently not taking his medication
3. During this altercation Mr. Joseph was struck and he received two discharges from a CEW
4. After he was subdued, handcuffed (with his hands behind his back), and shackled he was placed in the back seat of a police vehicle
5. His position in the vehicle was described as sitting upright and/or lying face down across the back seat with his knees flexed.
6. While in the back seat of the car he continued to struggle, yell and kick
7. After what is described as a few minutes, he was discovered to be unresponsive by the police
8. Paramedics who were present found him to be pulseless and apneic.
9. Treatment resulted in a return of spontaneous circulatuon (ROSC) and $E_tCO_2$ was determined twice. It was noted to be 43mmHg at the time of ROSC and 38 mmHg 3 minutes after the ROSC.
10. He was transported to the Oschner West Hospital where an ititial tempurature of 101° F was noted along with multiple laboratory abnormalities including a potassium of 8.1, a creatinine of 2.4, and a CPK of 2624

11. Mr. Joseph never regained consciousness and died two days later with acute renal failure and a diagnosis of rhabdomyolysis
12. Both an admission blood test (marked blood) and an autopsy heart blood test 2 days later (at autopsy) revealed diphenhydramine in a concentration of 2100 ng/ml
13. His autopsy weight was recored as 219 lbs and height of 72" yielding a calculated BMI of 29.7
14. The remainder of the autopsy revealed no other potentially lethal abnormalities and concluded Mr. Joseph "died as a result of acute psychosis exacerbated by diphenhydramine toxicity in the setting of schizophrenia while in police custody."
15. In a separate examination, Mr. Joseph's heart (455 grams) was reported to be structurally normal based upon normal heart weights of 290-506 grams (for a body weight of 212 lbs) and 241-481 grams (based upon a body height of 72 inches) from Kitzman Scholz, Hagen, et al. Mayo Clin Proc 63:137-146, 1988.
16. Medical records dated in January of 2017 revealed normal renal function

Before addressing the question you asked of me, one must understand in circumstances such as these, asphyxiation, should it occur, would be due to inability to ventilate (breathe) to a degree such that blood oxygen levels fall, which ultimately causes the heart to stop. This is a process that in general, takes at least five minutes of no breathing at all because this process requires time for the oxygen stores in the lung to be depleted and then for the oxygen level in the blood to fall so low as to cause the heart to stop. Minor alterations in the ability to breathe (such as someone with mild asthma) or minor falls in blood oxygen levels (if you go to Aspen to go skiing your blood oxygen level will fall by approximately 8%) are not clinically relevant.

The specific issue you asked me to address has several components to it. Firstly one must address the question of whether asphyxia could reasonbably occur based upon the sequence of events in this case. Secondly, are there are any experimental data in the literature to support the notion asphyxiation would occur in circumstances such as these, and finally, does the basic physiology of ventilation predict any hypoxemia (low blood oxygen) would occur in this circumstance. Obviously opinions are always based on the data at hand. Should aditional records become avaialable I must reserve the right to amend and/or update my opinions.

**1. Is it more likely than not asphyxia occurred based upon what is described as the sequence of events in this case.**

Given what apear to be the sequence of events in this case, asphyxiation is essentially impossible. Mr Joseph was screaming and fighting as he was put in the police vehicle and continued to do so for some period of time. Although Dr. Baden describes Mr. Joeph as being "squeezed" in the back of the police vehicle, there is no evidnece or description that any pressure (i.e. "squeezing") was applied to him. When taken out of the vehicle only a few minutes later he was pulseless and apneic. For an indiviual to suffer a cardiopulmonary arrest from asphyxiation would (as noted above) require at least 5 minutes of no breathing at all for which there is no evidence in this case. Additionally the $E_tCO_2$ performed by paramedics in the field during spontaneous circulation  also makes asphyxiation highly unlikely in this situation as carbon dioxide levels rise dramatically in cases of mechanical asphyxiation due to inadequate ventilation.

**2. Are there any experimental data in the literature to support the notion that asphyxiation would occur in circumstances such as these?**

By way of background, positional or restraint asphyxia is a term initially used to describe the deaths of individuals who were found in body positions which compromised ventilatory (respiratory) function to such a degree that death ensued..  Most commonly, these cases involved individuals in whom their position led to obstruction of the upper airway (such as from extreme head-neck hyperflexion) and who were generally alcohol intoxicated (to the point of being unable to remove themselves from the lethal position).  In the late 1980s, this term was then applied as a cause of death in reports of sudden deaths that occurred to persons who were being restrained while in custody. It had been and continues to be observed individuals, most commonly under the influence of a variety of drugs, but for that matter, individuals in an agitated state from psychosis (and typically those who have stopped taking their medications as did Mr Joseph), may die suddenly. Since many of these individuals had been placed in a restraint position, because of their behavior, at the time of their death, it was hypothesized the position might somehow play a role in these deaths. It is critical to be aware however, the experimental basis for the concept restraint positioning causes asphyxia comes from a single article published in the late 1980's.  Since that article was published some physicians ascribed a variety of in-custody

5

deaths to asphyxia in a number of case series. Ultimately, these case series all are based upon the previously mentioned paper or other case series as the bases of their conclusions. There were however, major problems with the initial research, which first generated the notion of asphyxia related to restraint positions.  Some of these problems were: (1) the premises were incorrect, (2) the methodology was inappropriate, (3) the logic was flawed, and (4) the statistics were in error. Indeed the author of this paper has now written, "the hog-tied prone position should be viewed as not producing significant physiologic respiratory compromise, and it does not produce any serious or life-threatening respiratory effects" and he has testified the "hog-tie" position is physiologically neutral.

In 1997 my colleagues and I, working at University of California, San Diego, published the first of over half a dozen peer-reviewed papers that clearly demonstrated the prone restraint position with or without weight up to 225 pounds on the back does not result in changes in ventilation sufficient to cause asphyxia. We also demonstrated this position, after very heavy exercise, has no effect upon the amount of oxygen or carbon dioxide in the blood.  Importantly, since our initial publication, our findings have been corroberated in orther laboratories throughout the world utilizing a number of different experimental conditions.  Of note, is that there is not a single experimental paper in the entire peer reviewed literature which demonstrates a fall in blood oxygen (an absolute requirement for the process of mechanical asphyxiation to occur) in circumstances of restraint. Although there was a *temporal* relationship between Mr. Joseph' restraint and his death, one must be careful about ascribing causality to a temporal relationship. The rooster crows and then the sun comes up. No one would suggest that the sun comes up *because* the rooster crows in spite of the clear-cut *temporal* relationship. Ascribing causality because of a *temporal* relationship is a classical logical error and has a specific Latin phrase to describe it. It is called a "*post hoc ergo propter hoc*" argument (after the fact; therefore because of the fact). Once again, in the entire literature on this subject there has never been *any* hypoxemia (low blood oxygen) noted.

### 3. Does the basic physiology of ventilation predict any hypoxemia (low blood oxygen) would occur in this circumstance?

The notion that minimal loads upon the chest and or abdomen will cause hypoxemia (low blood oxygen) in circumstances such as these by sufficiently limiting ventilation and the movement of the diaphragm is based

upon basic misunderstandings of ventilatory physiology. It has been opined that when an overweight individual is restrained in the 4 point prone maximum restraint, the compression of the abdomen by the position pushes up on the diaphragm limiting the individual's ability to breathe.  However, these opinions have been made without the benefit of  experimental data to support them. The data that do exist for abdominal compression of this sort clearly demonstrate abdominal compression does not adversely affect ventilatory response to exertion in the restraint position. Again actual experiments refute such speculation but a basic understanding of the ventilatory system's ability to adapt to external loading and a basic appreciation of muscle physiology and diaphragmatic anatomy would have led one to the same conclusion. This is confirmed by previously mentioned studies as well as a recently performed study on obese individuals (all with a BMI greater than 30) indicating no change in oxygen saturation after heavy exercise and 15 minutes of prone maximum restraint. However, in this case Mr. Joseph's BMI was only 29.7.

Additionally, individuals unfamiliar with the kinds and meaning of the spirometric indices measured in our studies have often misunderstood the changes we have observed and they have stated these changes represent a "reduction in breathing" or "difficulty breathing."  These indices are measurements of what a restrained individual is maximally _capable_ of and they are not measurements of what restrained individuals _actually do_ or _need to do_ in response to a given level of exertion. From the point of view of basic physiology, for someone trained in the science of ventilation and with an understanding of exercise physiology, it is a relatively simple matter to calculate the amount of ventilation needed by individuals in different circumstances. These calculations match well with the observed levels of ventilation in experimental subjects and demonstrate why the stressors of position with or without weight on the back in circumstances such as these would be expected to have essentially no effect upon the levels of oxygen and carbon dioxide in the blood. I cannot emphasize strongly enough that without the ability to quantitatively assess the effects of ventilatory loading and the oxygen requirements in any given situation, any expert's comments about "positional asphyxia"  and "difficulty breathing" due to position must be viewed as _ipse dixit_.

An additional point is whether Mr. Joseph was suffering from the excited delirium syndrome (EDS) at the time of his final interaction with the police. Dr. Esserman in her deposition points out "if you wanted to substitute

excited delirium into acute psychosis, I wouldn't terribly object to it." I would argue the elevation of creatinine, CPK and a number of the other laboratory abnormalities are all more consistant with EDS than with psychosis and the anticholinergic signs of diphenhydramine toxicity, however this doesn't alter the basic physiology of Mr. Joseph's death.

Although Dr. Baden seems to feel there is insufficient evidence of progressing agitation in this case, the elevation of creatinine to a level of 2.4 indicates this process had been going on for a considerable period of time. Dr. Baden further seems to imply the elevated CPK, rhabdomyolysis, and elevated creatinine were due to the trauma Mr. Joseph received, but without major evidence of direct muscle injury on autopsy this is highly unlikely.

Thus the most likely explanation of this case (given the rapidity that Mr. Joseph went from struggling and fighting to cardiorespiratory arrest) is that the mechanism of death is that of lethal cardiac arrhythmia  in the setting of acute psychosi and diphenhydramine toxicity (or in the setting of EDS with the additional anticholinergic effects of diphenhydramine) as described by Dr. Esserman.

In summary then, the clinical diagnosis in this case is not that of an asphyxial death. The description of the event as well as the $E_tCO_2$ present a picture incompatible with asphyxiation. There are no experimental data which demonstrate a lowering of blood oxygen occurs under these circumstances nor are there data to indicate the necessary amount of ventilation for these circumstances is clinically compromised.

Thus my primary opinions (to a reasonable level of medical certainty) are:
1. Mr. Joseph did not die of asphyxia.
2. Asphyxia did not contribute to Mr. Joseph's death.
3. Mr. Joseph' death was due to a lethal arrhythmia in the setting of an agitated state (likely the excited delirium syndrome) with ongoing psychosis and evidence of diphenhydramine toxicity

Once again, these opinions are based upon the information so far supplied to me and further accounts of the events that took place and additional medical records may alter my final opinions. I look forward to reviewing any additional testimony or material, which might affect my opinions.

Very truly yours,

Tom S. Neuman, M.D., FACP, FACPM, FUHM
Emeritus Professor of Medicine
University of California, San Diego