KATIE JOSEPH, ET AL.,                                   CIVIL ACTION
    **Plaintiffs**

**VERSUS**                                              **NO. 17-5051**

**JOHN DOE, ET AL.,**                                   **SECTION "E" (4)**
    **Defendants**

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by Defendants Damond Bartlett, Duston Costa, Shannon Dugas, Robert Faison, Brandon Leduff, Eddie Martin, Arthur Morvant, James Price, Julius Rolland, Thomas Thompson, Angelo Varisco, Steven Verrett, and Dustin Vinet.[1] Plaintiffs Katie Joseph and Sheresa Jackson oppose the motion.[2] Defendants have filed a reply and a surreply.[3] For the reasons that follow, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND[4]

On February 7, 2017 at approximately 11:40 a.m., Kendole Joseph (the "Decedent") made two phone calls to the Jefferson Parish Emergency Communications 9-1-1 Call Center requesting assistance because he believed "fake police" were trying to harm him.[5] The Decedent's calls were made from the Wal-Mart on Manhattan Boulevard, in Harvey, Louisiana.[6] About two hours later, at approximately 1:31 p.m., the Decedent's mother,

---

[1] R. Doc. 72.
[2] R. Docs. 106 and 149.
[3] R. Docs. 110 and 154.
[4] The factual background is derived from Plaintiffs' Third Amended complaint, R. Doc. 53; the parties' statements of material fact, R. Docs. 82, 106-41, 106-42; and video surveillance footage of the incident, R. Doc. 72-4 (manual attachment). The Court construes all facts and makes all inferences in the light most favorable to Plaintiffs as the non-movants. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hibernia Nat. Bank*, 997 F.2d at 98; *Byrd v. City of Bossier*, 624 F. App'x 899, 902 (5th Cir. 2015) ("When the movant and the non-movant's version of the facts diverge, we must accept the non-movant's version.") (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).
[5] R. Doc. 53 at ¶¶ 8, 9; R. Doc. 106-41 at ¶ 1.
[6] R. Doc. 53 at ¶ 8.

Debra Guillory, contacted the Gretna Police Department seeking assistance for her son, explaining that the Decedent was a paranoid schizophrenic with bipolar disorder who was experiencing a mental health crisis.[7] Ms. Guillory explained that the Decedent believed the "fake police" had killed her and the Plaintiff's stepfather and that the "fake police" were now trying to kill him.[8] She provided the dispatcher with a description of what the Decedent was wearing and warned the dispatcher that the Decedent would likely run if approached by uniformed police officers.[9] Although Ms. Guillory called the Gretna Police Department, her call was immediately transferred to the Jefferson Parish Sheriff's Office because she reported the Decedent was in Harvey rather than in Gretna.[10]

Later that day, on February 7, 2017, D'Amica George, the Assistant Principal of Gretna Middle School, notified Defendant Thompson, a Gretna Police officers who served as school resource officer, that a "strange guy," later identified as the Decedent, was standing in front of the school.[11] According to George, "[The] Decedent appeared really nervous and shaky, he was staring, and he was not walking straight but rather weaving[,] . . . talking to himself," shaking his leg, and biting his fingernails.[12] Officer Morvant stated that the assistant principal advised him that the Decedent was acting suspicious, talking to himself, and saying "stuff she couldn't make out."[13] Officer Morvant heard the Decedent yelling "help me from the police."[14] When Officer Morvant approached, the Decedent ran

---

[7] R. Doc. 53 at ¶ 10; R. Doc. 106-41 at ¶ 2.
[8] R. Doc. 106-41 at ¶ 2.
[9] R. Doc. 53 at ¶ 10.
[10] Ms. Guidry told the dispatcher that her son was on Manhattan Boulevard near the Best Buy, which is in Harvey, Louisiana, not Gretna. R. Doc. 72-11 (manual attachment).
[11] R. Docs. 106-41 at ¶ 6, 106-2 at 5, 106-2 at 5. Officer Thompson confirmed that this occurred. R. Doc. 106-31 at 24.
[12] R. Doc. 106-41 at ¶¶ 4, 5.
[13] R. Doc. 106-11 at 1-2.
[14] *Id.* at 2.

away from and not toward the school,[15] and "began pulling on the locked door handles of random vehicles stopped on Gretna Boulevard and pleading with them to 'help [him] from the police.'"[16] Officer Morvant observed the Decedent running in the traffic pleading for help and the officer stopped the traffic.[17] Officer Morvant found Decedent's behavior to be off and erratic and knew there was a possibility that Decedent was an emotionally disturbed person.[18] Officer Morvant radioed other officers in the area, reporting "a suspicious person who was fleeing."[19] Officer Morvant did not indicate in his radio transmission that the Decedent had committed or was suspected of committing a crime, that he had any weapons, or that he was a threat to anyone.[20] Officer Leduff testified that he heard Officer Morvant's transmission and that he and Officer Martin were in radio contact with Officer Morvant while they drove about two miles to the convenience store.[21] Officer Leduff stated that Officer Morvant related that he got word from the school's principal that "a subject [was] coming on and off the property" and that he had "tried to talk to the guy at which time the guy uh took off on him uh head down uh Gretna Boulevard."[22]

Defendants Martin and Leduff[23] located the Decedent approximately two blocks from where Officer Morvant had encountered him.[24] When Officers Martin and Leduff approached, the Decedent ran into a Save-A-Dollar convenience store. Officer Martin did not see a weapon in the Decedent's hands or a bulge in his waistband and did not see the

---

[15] R. Docs. 72-1 at ¶ 2, 106-42 at ¶ 2.
[16] R. Doc. 106-41 at ¶ 12, 106-28 at 18.
[17] R. Doc. 106-11 at 3.
[18] R. Doc. 106-27, p. 19, lines 4-9, p. 23 lines 22-p. 24 lines 21-23, p. 25 lines 17-25.
[19] R. Docs. 72-1 at ¶ 3, 106-42 at ¶ 3.
[20] R. Doc. 106-20 at 60.
[21] R. Doc. 106-26 at 46.
[22] R. Doc 106-6 at 2.
[23] Officer Martin is a field training officer and Officer Leduff was his trainee. R. Doc. 106-20 at 57.
[24] R. Doc. 106-41 at ¶ 19.

Decedent reach for his waistband.[25] Officer Morvant knew that the Decedent was acting in a strange manner, was screaming for help from the police, was running down the street in active traffic, and had fled from an officer.[26] Outside the store, Officers Martin and Leduff exited their vehicle and gave the Decedent loud voice commands to come to them, but the Decedent entered the store.[27]

The officers followed the Decedent into the store. Officer Martin drew his weapon before he went into the store and, once inside, immediately pointed his gun at the Decedent.[28] The Decedent was shouting "help me, help me, somebody call the cops . . . they're trying to kill me."[29] Officer Martin told the Decedent to get on the ground.[30] The Decedent reacted by jumping behind the checkout counter, landing on his back.[31] Sharon Walker, the clerk in the convenience store, testified that the Decedent "went face down" as soon as he jumped over the counter, that he looked scared, and that the police immediately were "on top of him."[32] The Decedent held his hands up over his face and assumed the fetal position.[33] Officer Martin then followed the Decedent over the counter and immediately went "hands on with him."[34] Officer Martin, who at the time weighed 300 pounds, immediately placed his body on top of the Decedent, who was lying on the floor with his legs bent to his chest.[35] Officer Brandon Leduff followed Officer Martin over the counter; Officer Leduff said in his recorded statement that the Decedent "goes straight

---

[25] R. Doc. 106-20 at pp. 72-73.
[26] *Id.* at p. 94.
[27] R. Doc. 106-26 at 55.
[28] R. Doc. 106-41 at ¶ 29, 106-20 at p. 71 and p. 74.
[29] R. Docs. 72-1 at ¶¶ 5–6, 106-42 at ¶¶ 5–6, 106-41 at ¶ 27.
[30] R. Doc. 106-20 at p. 78.
[31] R. Docs. 72-1 at ¶ 6, 106-42 at ¶ 6, 106-41 at ¶ 30.
[32] R. Doc. 106-23 at 13-14.
[33] R. Docs. 72-1 at ¶ 8, 106-42 at ¶ 8; R. Doc. 72-4 at 1:08–11 (camera 9).
[34] R. Doc. 106-20 at p. 85
[35] *Id.* at p. 92, R. Doc. 72-4 at 1:08–11 (camera 9).

to the ground and he is uh he's saying all types of things some I really don't remember I don't remember what he was saying at the time the only thing I can recall is him saying he's about to be killed or something of that nature."[36] Officer Leduff testified at his deposition that the Decedent was screaming that the officers were going to kill him "before we even made contact,"[37] "as soon as we made it to the ground."[38] Officer Morvant, the officer who had direct communication with the assistant principal personally observed the other unusual behavior of the Decedent, was the third officer behind the counter,[39] just seconds after Martin and Leduff, and assisted in holding down the Decedent's.[40] Officer Morvant had received training about dealing with emotionally disturbed people, understood the importance of using de-escalation techniques in dealing with them, and understood that the use of violence against such an individual can escalate to more violence.[41]

Sharon Walker testified that the Decedent repeatedly said, "My name is Kendole Joseph and I do not have a weapon."[42] Officer Faison testified that, after the Decedent was handcuffed, he heard him "ask people to call the real police" and heard him screaming, "They're killing me, they're killing me. Get them off of me. Somebody call the police." While the officers were on top of him, the Decedent pleaded with bystanders to "call the real police," asked for his mother, yelled "My name is Kendole Joseph and I do not have a weapon," and exclaimed the officers were "killing [him]."[43] Officer Faison

[36] R. Doc 106-6 at 5.
[37] R. Doc. 106-26 at 22.
[38] *Id.* at 24.
[39] R. Doc. 106-11 at 4.
[40] R. Doc. 72-4, at 1:03-1:13 (camera 6).
[41] R. Doc. 106-28 at 11-12.
[42] R. Doc. 106-23 at 16.
[43] *Id.* at ¶ 41.

admitted that this was an unusual occurrence.[44] Officer Faison testified that the Decedent's behavior "could have been mental. It could have been drug induced."[45] Officer Damond Bartlett testified that the Decedent was "yelling random things,"[46] and that he was saying "call the police" and that he called out for his mother, [47]as he lay behind the counter.

Officer Leduff in his recorded statement said that the Decedent was laying "kinda on his front side" with his hands "kinda like crossed" underneath him.[48] Officer Bartlett testified that the Decedent was "laying face down with his hands under his chest near his waist line."[49] Sharon Walker, the store clerk, testified that the Decedent was wiggling his body and struggling with the police.[50] Several other officers appeared on the scene—fourteen Gretna Police officers in total—many of whom came behind the counter in an attempt to hold down the Decedent's arms and legs.[51]

Approximately thirty seconds into the encounter, Officer Martin tased the Decedent in the back for eleven seconds "while [the] Decedent was laying on his stomach and partially on his right side with Officer Leduff controlling his shoulder area/upper body beforehand and Officer Morvant holding down his lower body."[52] Shortly thereafter, Officer Martin struck the Decedent twice with the pointed-end of his baton.[53] Approximately one minute later, Officer Martin tased the Decedent again, this time for

---

[44] R. Doc. 106-21 at p. 27- 29 and p. 83.
[45] R. Doc. 106-25 at 88.
[46] *Id.* at 77.
[47] *Id.* at 102.
[48] R. Doc 106-6 at 5.
[49] R. Doc. 106-25 at 91.
[50] R. Doc. 106-22 at 25.
[51] R. Doc. 72-4 (cameras 4, 9); R. Doc. 72-18 at 8.
[52] R. Doc. 106-41 at ¶¶ 60, 62.
[53] *Id.* at ¶ 66.

three seconds.[54] Officer Costa kicked the Decedent between twelve and thirteen times, holding the counter for leverage,[55] after which Officer Martin punched the Decedent in the head three times, before the officers moved the Decedent to a larger area behind the counter, whereupon Officer Martin again struck the Decedent in the face approximately three times.[56] Officer Costa then punched the Decedent in his head six times. Other officers who were behind the counter holding the Decedent down were Officers Dugas, Rolland, and Verrett.[57] Three and a half minutes later, Officers Costa, Verrett, and Martin placed the Decedent in handcuffs and leg shackles.[58]

Throughout the course of the encounter inside the store, which lasted for approximately eight minutes, the Decedent sustained twenty-six blunt force impact injuries to his face, chest, back, extremities, scrotum, and testes.[59] At no point did the Decedent attempt to strike the officers[60] and, although he was at times flailing his legs, he did not make contact with any officer.[61] The surveillance footage shows several officers sitting on top of the Decedent throughout the incident. For substantial portions of the video, it does not appear the Decedent is struggling with the officers. At no point did any officer take any action, physical or oral, to intervene in the use of force or attempt to de-escalate the encounter to reduce the need for force.

The Decedent was placed in arm and leg restraints and carried face down, by the handcuffs and leg shackles, out to Officer Martin's patrol car by Officers Varisco, Martin,

---

[54] *Id.* at ¶ 60.
[55] R. Doc. 72-4 at 3:50–4:12 (camera 9).
[56] R. Doc. 106-41 at ¶ 81.
[57] *Id.*-41 at¶ ¶ 31, 74, and 86.
[58] *Id.* at¶ 90; R. Doc. 72-4 at 5:05–8:30.
[59] R. Doc. 106-41 at ¶ 174.
[60] *Id.* at ¶¶ 43–44, 47.
[61] *Id.* at ¶ 47.

Rolland, and Verrett.[62] Officers Martin, Faison, Dugas, Morvant, Verrett, Rolland, Vinet, Varisco, Leduff and Costa placed the Decedent feet-first into the car and pulled him "across the seat from the other side, bent his legs up, and shut the doors with [the] Decedent in a prone position on the seat facedown."[63] By this time, Emergency Medical Services ("EMS") had arrived on the scene. Although the Decedent had been tased twice and was bleeding, the officers "did not procure aid for [the] Decedent and instead had EMS assist them with cleaning their own bodies of [the] Decedent's blood while [he] . . . lay improperly restrained in the car in a position that limited his ability to breathe."[64] After being in the squad car for a period of time, the Decedent became unresponsive.[65] Upon being discovered unresponsive in the unit, the Decedent was examined by emergency medical personnel.[66] EMS began performing cardiopulmonary resuscitation ("CPR") on the Decedent and took him to the hospital, where he arrived at approximately 2:12 p.m.[67] Although eventually there was a return of spontaneous blood circulation, the Decedent remained comatose, and ultimately died from his injuries on February 9, 2017.[68]

Based on these events, Plaintiffs bring five claims against all Defendants, unless otherwise noted:

(1) Fourth Amendment claim for excessive force/failure to intervene, pursuant to 42 U.S.C. § 1983;

(2) Fourteenth Amendment claim for deliberate indifference to the Decedents severe medical needs, pursuant to 42 U.S.C. § 1983;

---

[62] *Id.* at ¶ 100.
[63] R. Docs. 53 at ¶ 27, 106-42 at ¶ 16.
[64] R. Doc. 106-42 at ¶ 28.
[65] The amount of time the Decedent was unresponsive in the squad car before being discovered is disputed but is not material to the Court's decision. R. Doc. 106-42 at ¶¶ 17, 19.
[66] R. Docs. 72 at ¶ 19, 106-42 at ¶ 19.
[67] R. Doc. 106-41 at ¶ 165.
[68] *Id.* at ¶ 170. The Decedent's cause of death is disputed. For purposes of this order, the Court views the facts in the light most favorable to the Plaintiffs, as it must. *See* n.4, *supra*.

(3) State law based claim for battery, pursuant to Louisiana Revised Statutes 14:33, which Plaintiffs bring against Officers Martin and Costa only;

(4) State law-based claim for wrongful death, pursuant to Louisiana Civil Code article 2512.2;

(5) State law-based survival action, brought pursuant to Louisiana Civil Code article 2315.1.[69]

On August 7, 2018, Defendants filed the instant motion, asserting a qualified immunity defense and seeking judgment as a matter of law on Plaintiffs' Fourth and Fourteenth Amendment claims against them.[70]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[71] "An issue is material if its resolution could affect the outcome of the action."[72] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[73] All reasonable inferences are drawn in favor of the non-moving party.[74] There is no genuine issue of material fact if, even viewing the evidence in the light most

---

[69] Plaintiffs filed their original complaint on May 18, 2017. R. Doc. 1. On June 20, 2017, Plaintiffs filed their First Amended Complaint, R. Doc. 7, followed by their Second Amended Complaint on November 7, 2017, R. Doc. 40. On April 23, 2018, Plaintiffs dismissed Claims I–VI of their Second Amended Complaint, with prejudice, with respect to Defendants Jason Dufrene, Todd Henry, Kolby Arabie, Brad Cheramine, and Vincent Paz. R. Docs. 51, 56. On April 23, 2018, Plaintiffs filed their Third Amended Complaint. R. Doc. 53. In their Third Amended Complaint, Plaintiffs included a *Monell* claim against the City of Gretna, which they dismissed, with prejudice, on August 6, 2018. R. Doc. 69. Plaintiffs also dismissed Count III of the Third Amended Complaint, a state law-based claim for battery, with respect to Defendants Bartlett, Morvant, Thompson, Leduff, Vinet, Dugas, Rolland, Verrett, Faison, Varisco, and Price only. *Id.* The Court notes that, having dismissed Count VI of Plaintiff's Second Amended Complaint with respect to Defendants Dufrene, Henry, Arabie, Cheramine, and Paz only, the claim of False Arrest has not been dismissed with prejudice with respect to the remaining Defendants, Bartlett, Costa, Dugas, Faison, Leduff, Martin, Morvant, Price, Rolland, Thompson, Varisco, Verrett, and Vinet. Plaintiffs did not reurge this claim in their Third Amended Complaint; as a result, no claim is pending against any Defendant based on false arrest.

[70] R. Docs. 72, 82.

[71] FED. R. CIV. P. 56; *see also Celotex*, 477 U.S. at 322–23.

[72] *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

[73] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

[74] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[75]

Government officials may assert a qualified immunity defense in a Rule 56 motion for summary judgment. Once a defendant asserts qualified immunity as a defense, the plaintiff bears the burden of demonstrating the defendant is not entitled to its protections.[76] The qualified immunity defense serves to shield government officials, sued in their individual capacities and performing discretionary functions, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[77]

For a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"[78] "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[79] "Officials should receive the protection of qualified immunity 'unless the law is clear in the more particularized sense that reasonable officials should be put on notice that their conduct is unlawful.'"[80] "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[81] "The court's focus, for purposes of the 'clearly established' analysis should be on 'fair warning': qualified immunity is unavailable 'despite notable factual distinctions between the precedents

---

[75] *Hibernia Nat. Bank v. Carner*, 997 F.2d 94, 98 (5th Cir. 1993) (citing *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147–48 (5th Cir. 1992)).
[76] *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).
[77]*White v. Pauly*, 137 S. Ct. 548, 549 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)); *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004).
[78] *Id.*
[79] *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).
[80] *Id.* at 393 (quoting *Kinney*, 367 F.3d at 350).
[81] *White*, 137 S. Ct. at 549.

relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[82]

## LAW AND ANALYSIS

Defendants seek summary judgment on Plaintiffs' 1983 claims made under the Fourth and Fourteenth Amendments. Because the Defendants have properly invoked the doctrine of qualified immunity,[83] the burden has shifted to the Plaintiff to show that the Defendants are not immune from suit in their individual capacities. In resolving questions of qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry.[84] It is within the Court's discretion to decide which of the two prongs should be addressed first in light of the circumstances of the case.[85]

The first prong of the inquiry asks whether the facts, taken in the light most favorable to the Plaintiff, show the officer's conduct violated a constitutional right. "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against excessive seizures."[86] When a pre-trial detainee alleges deliberate indifference to a serious medical need, the federal right at issue is the Eighth Amendment right not to be subjected to cruel and unusual punishment made applicable to the states through the Fourteenth Amendment.[87] The second prong of the inquiry asks whether the right in question was clearly established at the time of the violation.[88] The state actor's conduct must be objectively reasonable in light of the clearly

---

[82] *Wernecke*, 591 F.3d at 392 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).
[83] R. Docs. 72, 82.
[84] *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).
[85] *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017).
[86] *Graham v. Connor*, 490 U.S. 386, 394 (1989).
[87] *See Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citing *Robinson v. California*, 370 U.S. 660, 666–67 (1962)).
[88] *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 232–36 (2009); *see also Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citing *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011)).

established legal rules that existed at the time of his or her actions.[89] This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."[90] Under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.[91]

To prevail on an excessive force claim against Officers Martin and Costa, the Plaintiffs must show (1) an injury (2) that resulted directly and only from the use of force that was clearly excessive to the need and that (3) the force used was objectively unreasonable.[92] To prevail on a failure to intervene claim against an officer, the Plaintiffs must prove that the Defendants (1) knew that a fellow officer was violating an individual's constitutional rights; (2) were present at the scene of the constitutional violation; (3) had a reasonable opportunity to prevent the harm; and (4) choose not to act.[93] To prevail on a claim of deliberate indifference to a serious medical need, the Plaintiffs must demonstrate an Eighth Amendment violation by showing that a prison official "refused to treat [the Decedent], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[94]

---

[89] *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

[90] *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citing *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)); *see also Malley v. Briggs*, 475 U.S. 335, 343 (1986); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

[91] *See Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004) (per curiam); *Hope*, 536 U.S. at 733 n.1; *Saucier* 533 U.S. at 201.

[92] *Linicomn v. Hill*, 902 F.3d 529, 539 (5th Cir. 2018) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). The Defendants do not contest that an injury occurred from the use of force.

[93] *Adams v. City of Shreveport*, 269 F.Supp.3d 743 (W.D. La. 2017).

[94] *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. at 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." (internal quotation and citation omitted)); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) ("Since *Estelle v. Gamble*, state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.").

## I.  Plaintiffs' Fourth Amendment Claim

### A.  First Prong: The Plaintiffs Have Asserted a Claim that Decedent's Fourth Amendment Rights Were Violated by Officers Costa and Martin.

In *Pearson v. Callahan*, the Supreme Court determined that "while the [two-step] sequence . . . is often appropriate, it should no longer be required as mandatory," and gave lower courts permission to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[95] Although courts may engage in an analysis of the second prong first, and if that prong is not met are not required to address the first prong, the Supreme Court in *Pearson* recognized that undertaking the two-step procedure "is often beneficial . . . [because it] promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."[96] The Court considers the inquiry into the first prong to be valuable in this case to promote the development of constitutional precedent.

When a plaintiff alleges excessive force during an investigation or arrest the federal right at issue is the Fourth Amendment right not to be subjected to an unreasonable seizure.[97] The Plaintiffs allege this right has been violated. It is undisputed that only Officers Martin and Costa exerted force against the Decedent by punching, tasing, or kicking the Decedent.[98] Thus, the remaining Defendants—Bartlett, Dugas, Faison, Leduff, Morvant, Price, Rolland, Thompson, Varisco, Verrett, and Vinet—may be held liable only

---

[95] 555 U.S. at 236.
[96] *Linicomn*, 902 F.3d at 535 (quoting *id.*).
[97] *See Graham*, 490 U.S. at 394.
[98] R. Doc. 72-18 at 22; R. Doc. 69 (dismissing battery claim against all officers other than Officers Martin and Costa).

to the extent their failure to intervene in Officers Martin and Costa's treatment of the Decedent violates the Fourth Amendment.

The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."[99] The totality of the circumstances must justify the search or seizure.[100] The Court must evaluate the reasonableness of each officer's actions separately.[101] "Excessive force claims are fact-intensive.

As set forth in the background section above, it is undisputed the officers followed the Decedent into the store and Officer Martin immediately pointed his gun at the Decedent.[102] The Decedent reacted by jumping behind the checkout counter, landing on his back.[103] The Decedent held his hands up over his face and assumed the fetal position.[104] Officers Martin and Leduff immediately followed the Decedent over the counter. Once behind the counter, Officer Martin immediately placed his body on top of the Decedent, who was lying on the floor with his legs bent to his chest.[105] Many other officers appeared on the scene—fourteen Gretna Police officers in total—many of whom came behind the counter in an attempt to hold down the Decedent's arms and legs.[106]

It also is undisputed that approximately thirty seconds into the encounter, Officer Martin tased the Decedent in the back for eleven seconds "while [the] Decedent was laying on his stomach and partially on his right side with Officer Leduff controlling his shoulder

---

[99] Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009)(quotations omitted).
[100] *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).
[101] *Poole*, 691 F.3d at 628.
[102] R. Doc. 106-41 at ¶ 29.
[103] R. Docs. 72-1 at ¶ 6, 106-42 at ¶ 6, 106-41 at ¶ 30.
[104] R. Docs. 72-1 at ¶ 8, 106-42 at ¶ 8; R. Doc. 72-4 at 1:08–11 (camera 9).
[105] R. Doc. 72-4 at 1:08–11 (camera 9).
[106] R. Doc. 72-4 (cameras 4, 9); R. Doc. 72-18 at 8.

area/upper body beforehand and Officer Morvant holding down his lower body."[107] Shortly thereafter, Officer Martin struck the Decedent twice with the pointed-end of his baton.[108] Approximately one minute later, Officer Martin tased the Decedent again, this time for three seconds.[109] Officer Costa kicked the Decedent between twelve and thirteen times, holding the counter for leverage,[110] after which Officer Martin punched the Decedent in the head three times, before the officers moved the Decedent to a larger area behind the counter, whereupon Officer Martin again struck the Decedent in the face approximately three times.[111] Officer Costa then punched the Decedent in his head six times. Three and a half minutes later, the officers placed the Decedent in handcuffs and leg shackles.[112] Throughout the course of the encounter inside the store, which lasted for approximately eight minutes, the Decedent sustained twenty-six blunt force impact injuries to his face, chest, back, extremities, scrotum, and testes.[113]

The Fifth Circuit has explained that, to determine whether the use of force is excessive, the Court must apply factors the Supreme Court laid out in *Graham v. Connor*.[114] First, the Court first must consider the severity of the crime the suspect committed or is suspected of committing. In this case, it is undisputed that the Decedent had not committed and was not suspected of committing *any* crime. Officer Morvant reported "a suspicious person who was fleeing" and did not identify at that time or later any crime that person had committed or was suspected of having committed.[115] The fact

---

[107] R. Doc. 106-41 at ¶¶ 60, 62.
[108] *Id.* at ¶ 66.
[109] *Id.* at ¶ 60.
[110] R. Doc. 72-4 at 3:50–4:12 (camera 9).
[111] R. Doc. 106-41 at ¶ 81.
[112] R. Doc. 72-4 at 5:05–8:30.
[113] R. Doc. 106-41 at ¶ 174.
[114] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citing *Graham*, 490 U.S. at 396).
[115] R. Docs. 72-1 at ¶ 3, 106-42 at ¶ 3.

that the Decedent had not committed and was not suspected of having committed a crime made the need for force substantially lower than if he had been suspected of a serious crime.[116]

Second, the Court must consider whether the suspect posed an immediate threat to the safety of the officers or others. At the very inception of this incident, D'Amica George relayed to Officers Thompson and Morvant the peculiar and troubling behavior of the Decedent. Officer Leduff stated that Officer Morvant relayed information gained from Ms. George to him and Officer Martin, along with his report of a suspicious person fleeing. In fact, Officers Leduff and Martin were in constant radio communication with Officer Morvant as they approached the convenience store. They saw the Decedent running and entering the convenience store and heard him plead for help from the police and indicate that he was afraid of the police.[117] The Defendants deny that they knew the Decedent was experience a mental health crisis,[118] but for purposes of this analysis the Court must accept as true the Plaintiffs' position that the officers were aware of the Decedent's excited mental state. Upon entering the store Officer Martin immediately pointed his gun at the Decedent, even though the officers had not observed a weapon in the Decedent's hands or a bulge in his waist band to indicate he might be armed[119] and they had not seen him harm or threaten to harm anyone. When the Decedent jumped behind the counter, within seconds Officers Martin and Leduff followed him over the counter.[120] It is undisputed that the convenience store clerk also was in the area behind the counter at that time.[121] The

---

[116] *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (finding the need for force for a minor traffic violation substantially lower than for a serious crime).
[117] R. Doc. 106-41 at ¶¶ 27, 41.
[118] R. Doc. 111 at 14.
[119] R. Doc. 106-41 at ¶¶ 24–25.
[120] *Id.* at ¶¶ 30–31.
[121] The convenience store clerk can be seen in footage of the incident. R. Doc. 72-4 (cameras 4 and 9).

Defendants argue that the Decedent's actions posed an immediate threat to the clerk's safety. The video confirms that the Decedent approached the counter near where the clerk was standing and then moved well down the counter,[122] to an area removed from the clerk, before he jumped over[123]. The video also confirms that the Decedent did not approach or threaten to harm the clerk before he was forcefully pinned to the floor by the officers. Instead, the Decedent immediately fell to the floor and assumed a fetal, or defensive, position. "Although virtually all arrestees pose some level of threat to officers,"[124] the question is whether a reasonable officer could think it appropriate to apply the force used in light of the nature of the resistance. Taking the facts in the light most favorable to the Plaintiffs, there was no immediate threat to the safety of the officers or others.

Third, the Court must consider whether the Decedent attempted to evade arrest by flight or resisted arrest. First, it is clear from the video that the Decedent did not attempt to evade arrest by flight. Although the Decedent jumped over the counter in the convenience store, he did not attempt to leave the store and the Defendants have pointed to no evidence that he did. After jumping over the counter, the Decedent immediately dropped to the floor in a fetal position. Second, the Plaintiffs' version of the facts is that the Decedent did not resist arrest and, that if he did resist, his resistance was passive rather than active. In excessive force cases, the Fifth Circuit does distinguish between active and passive resistance.[125] Officers may consider a suspect's active or passive failure

---

[122] From the video, the distance appears to be approximately eight feet.

[123] R. Doc. 72-4 at 13:37:02 to 13:37:05 (camera 9).

[124] *Poole*, 691 F.3d at 639.

[125] *See Hanks v. Rogers*, 853 F.3d 739, 746 (5th Cir. 2017); *Poole v. City of Shreveport*, 691 F.3d 624, 640 (5th Cir. 2012); *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

to comply with instructions in assessing whether physical force is necessary to effectuate the suspect's compliance.[126] In doing so, officers must assess both the need for force and the relationship between the need and the amount of force used.[127] Passive resistance does not justify a significant use of force.[128] For example, in *Hanks v. Rogers*, the Fifth Circuit found an officer's "half-spear" blow was excessive in light of the suspect's passive resistance to a command to kneel.[129] In *Newman v. Guedry*, the Fifth Circuit found a plaintiff did not actively resist arrest when he made an off-color joke, pushed his body off the cop car and into the officers who were searching him, and did not fall to the ground after being tased.[130] Similarly, in *Deville v. Marcantel*, the Fifth Circuit found that a suspect passively resisted when she refused to get out of her car before her husband arrived on the scene.[131]

According to the Plaintiffs, at no point did the Decedent attempt to strike the officers[132] and, although he was at times flailing his legs, he did not make contact with any officer.[133] For substantial portions of the video, the Decedent is seen lying on the floor and does not appear to be struggling with the officers. At other times, he appears to be struggling against the officers but at no point can he be seen striking or attempting to strike an officer.[134]

At the time the Decedent jumped over the counter in the convenience store he had committed no crime and was not suspected of having committed a crime, he was unarmed

---

[126] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)
[127] *Id.*
[128] *Trammel v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017); *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681 (6th Cir. 2006).
[129] *Hanks*, 853 F.3d at 746.
[130] *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).
[131] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)
[132] R. Doc. 106-41 at ¶¶ 43–44, 47.
[133] *Id.* at ¶ 47.
[134] R. Doc. 72-4 (cameras 4 and 9).

and was not suspected of being armed, he had not used or threatened violence against anyone, and he was obviously acting in an irrational manner. Importantly, after jumping over the counter, the Decedent immediately fell to the floor and assumed a fetal position, held his hands up over his face,[135] pleaded with bystanders to "call the real police," asked for his mother, yelled "My name is Kendole Joseph and I do not have a weapon," and exclaimed the officers were "killing [him]."[136] Rather than attempting to decrease the need for the use of force, Officer Martin immediately pointed his gun at the Decedent[137] and jumped over the counter and forcefully placed his body on top of him.[138] In assessing the need for force, and the relationship between the need and the amount of force used, the officers should have taken into consideration the mental health crisis being experienced by the Decedent. Considering the facts in the light most favorable to the Plaintiffs, any resistance offered by the Decedent at the inception of the encounter was passive and did not justify the immediate use of force upon him. Nevertheless, Officers Martin and Costa immediately used force to pin him to the floor, and ultimately tased him twice, beat him with a baton, punched him in the head, and kicked him in the groin and elsewhere on the body. The officers made no attempt to negotiate with the Decedent in an attempt to de-escalate the confrontation prior to using force on him. The abruptness of the use of force may be considered by the Court in determining whether a constitutional violation has occurred.[139]

---

[135] R. Docs. 72-1 at ¶ 8, 106-42 at ¶ 8; R. Doc. 72-4 at 1:08–1:11 (camera 9).
[136] *Id.* at ¶ 41.
[137] R. Doc. 106-41 at ¶ 29.
[138] R. Doc. 72-4 at 1:08–1:11 (camera 9).
[139] *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the Plaintiffs.[140] Doing so, the Court concludes the Plaintiffs have asserted a violation of the Decedent's Fourth Amendment right not to be subjected to an unreasonable seizure. The Decedent had not committed and was not suspected of committing any crime, he posed no immediate threat to the safety of the officers or others, he did not attempt to evade arrest by flight, and any resistance he offered before the use of force was passive and did not justify a significant use of force. Officers Martin and Costa immediately resorted to force, without any attempt to de-escalate the volatile situation, despite their knowledge that the Decedent was mentally disturbed. Accordingly, Defendants Bartlett, Costa, Dugas, Faison, Leduff, Martin, Morvant, Thompson, Rolland and Stephen Verrett are not entitled to judgment as a matter of law on the basis of the first prong because they did violate the Decedent's Fourth Amendment right.[141]

**B. Prong Two: Disputed Issues of Fact Preclude Summary Judgment on Whether Officers Martin and Costa's Conduct Was Objectively Unreasonable in Light of Clearly Established Law.**

Finding a Fourth Amendment violation has been asserted is not the end the inquiry. Officers Martin and Costa are nevertheless entitled to qualified immunity under the second prong of the test unless their conduct was objectively unreasonable in light of clearly established law at the time of the violation.[142] A court considers only the information available to the officers at the time of the use of force. "The 'reasonableness'

---

[140] While courts may give greater weight to video recordings taken at the scene, *Griggs V.* Brewer, 841 F.3d 308 (5th Cir. 2016), the video evidence in this case does not clearly reveal the officers' version of events to be correct. *Chacon v. Copeland*, 577 Fed.Appx. 355 (5th Cir. 2014). As a result, the Court must accept the Plaintiffs' version of the facts as true for purposes of this motion.
[141] The Plaintiffs raise no factual disputes with respect to Fourteenth Amendment claims against Defendants James Price, Dustin Vinet, and Angelo Verisco. R. Doc. 106-41. Summary judgment on Fourth Amendment claims against these Defendants is granted.
[142] *Saucier*, 533 U.S. at 200; *see also Ramirez*, 716 F.3d at 375 (citing *Brown*, 663 F.3d at 249).

of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[143] A court must also recognize that officers often must make split-second decisions in stressful situations.[144]

As the Fifth Circuit has explained, it "could plausibly be asserted that any violation of the Fourth Amendment is clearly established," but the right violated "must be defined at the appropriate level of specificity before a court can determine if it was clearly established."[145] To be a clearly established right does not require that the exact conduct in question has previously been held to be unlawful, but prior decisions must have given reasonable warning that the conduct in question violated constitutional rights.[146] The Plaintiffs acknowledge this rule of law but fail to comply with it in their briefing.[147] The Court ordered the Plaintiffs to file a supplemental memorandum in opposition to the Defendants' motion for summary judgment based on qualified immunity showing with the appropriate level of specificity that the right violated was clearly established at the time of the violation.[148] Despite the Court's instruction, the Plaintiffs failed to articulate the specific contours of the clearly established Fourth Amendment right they claim has been violated.[149] Instead, they continue to describe the right on a high level as the right to be free of unreasonable seizures and argue the "right to be free from excessive force during an investigatory stop or arrest was clearly established at the time of the incident."[150] The Court will undertake this inquiry.

---

[143] *Connor*, 490 U.S. at 396.
[144] *Id.*
[145] *Wernecke*, 591 F.3d at 399 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).
[146] *See id.*
[147] R. Doc. 72-18 at 20.
[148] R. Doc. 149.
[149] R. Doc. 152.
[150] *Id.* at 2 (internal brackets omitted) (citing *Chacon v. City of Copeland*, 577 F. App'x. 355, 363 (5th Cir. 2014)).

Even if Officers Martin and Costa's actions violated the Decedent's Fourth Amendment rights, to determine the second prong of the inquiry "[w]here constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness."[151] For a court to deny an officer's assertion of qualified immunity based on the second prong, "existing precedent must have placed the statutory or constitutional question beyond debate."[152] "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff."[153] Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.[154] Thus, the liability of Officers Martin and Costa turns on whether the legal contours of the right were sufficiently clear at the time of the use of force and whether the violation would have been clear to a reasonable officer under the circumstances.

The Court must consider the state of the clearly established law on this point as of February 7, 2017 and determine whether it gave these officers fair warning that their conduct was unconstitutional. Under Fifth Circuit case law, an officer's use of force is excessive if she or he responds to resistance with a greater degree of force than is reasonably necessary. "Although officers may need to use 'physical force . . . to effectuate

---

[151] *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).
[152] *White*, 137 S. Ct. at 551 (internal quotation marks omitted).
[153] *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 457 (5th Cir. 2001) (citing *Anderson*, 483 U.S. at 641).
[154] *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam) (internal quotation marks omitted).

[a] suspect's compliance' when he refuses to comply with commands . . . the officers still must assess 'the relationship between the need and the amount of force used.'"[155] The Fifth Circuit has considered efforts to reduce the severity of a forceful response to be a factor to consider in deciding whether an office is entitled to qualified immunity on an excessive force claim. It is clearly established that a police officer uses excessive force when the officer strikes, punches or violently slams a suspect who is not resisting arrest.[156]

In *Newman v. Guedry*[157] the Fifth Circuit affirmed the district court's denial of qualified immunity when the Defendant officers "immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands" to "'effectuate [the] suspect's compliance.'"[158] The plaintiff in *Guedry* was a passenger in a car that had been pulled over; he himself had committed no crime and was not suspected of committing one. The officers nevertheless searched the plaintiff. During the search, the searching officer's "hand remained on [the plaintiff's] crotch for an uncomfortable length of time,"[159] causing the plaintiff to make an "off-color joke."[160] The officer responded by shoving the plaintiff, who "pushed himself off from the car and back onto the officers."[161] Thereafter, the officers tased the plaintiff and stuck him with a baton, contending the plaintiff failed to comply with a verbal command to get on the ground. Based on these facts, the Fifth Circuit affirmed the district court's denial of summary judgment on qualified immunity, explaining that, because the plaintiff had not committed any crime,

---

[155] *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).
[156] *Darden v. City of Fort Worth, Texas*, 880 F.3d 722 (5th Cir. 2018).
[157] *Newman v. Guedry, 703 F.3d 757 (5th Cir. 2012) (quoting Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009)).*
[158] *Id.* at 763.
[159] *Id.* at 760.
[160] *Id.* at 762.
[161] *Id.*

did not pose an immediate threat to himself or others, and offered only minimal resistance, the officers' use of force in arresting the plaintiff was unreasonable and therefore violated his Fourth Amendment rights.[162]

Similarly, in *Hanks v. Rogers,* the Fifth Circuit recently considered whether an officer's use of force was objectively reasonable in light of clearly established law at the time the conduct occurred.[163] Officer Rogers stopped Hanks for driving 20 miles per hour below the posted speed limit. Hanks was unable to provide proof of insurance. Hanks was facing away from the officer with his hands on the trunk of his car, on the back of his head, and then behind his back. Hanks' resistance consisted mostly of remaining on his feet for twenty seconds after the officer told him to kneel. The Fifth Circuit found that his resistance was at most passive and he made no attempt to flee.[164] The Fifth Circuit held that "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who presents no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation."[165]

---

[162] *Id.* at 763.

[163] 853 F.3d 739, 747 (5th Cir. 2017). It is important to note that this opinion is dated April 5, 2017, before the incident at issue occurred.

[164] *Hanks*, 853 F.3d at 747 (describing clearly established law as of February 2013) (citing *Deville*, 567 F.3d at 167–69 (denying qualified immunity where an officer making a minor traffic stop pulled the plaintiff out of her car and threw her up against the car because she passively resisted commands and presented no safety threat or flight risk)); *see also Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017) ("[T]he law [as of January 2013] clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp.") (citing *Ramirez*, 716 F.3d at 379; *Goodson*, 202 F.3d at 740).

[165] *Id.* at 747; *see also Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016) ("In denying qualified immunity, we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force.") (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); *Deville*, 567 F.3d at 167–68); *Doss v. Helpenstell*, 626 F. App'x. 453, 459–60 (5th Cir. 2015) (unpublished) (construing *Deville* as clearly establishing that an officer should receive no qualified immunity if he "quickly escalate[s]" an encounter with a non-threatening, passively-resisting driver who posed little risk of escape by employing overwhelming force "rather than continu[ing] to negotiate); *Deville*, 567 F.3d at 167–168 (finding qualified

In *Keele v. Leyva*, the Fifth Circuit listed the factors integral to the analysis of whether the force used was excessive to the need as: "(1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) *any efforts made to temper the severity of a forceful response*."[166] In *Galvan v. City of San Antonio*, the Fifth Circuit held the use of force was reasonable when it involved "measured and ascending" actions that corresponded to escalating verbal and physical resistance.[167] In the Newman case, the Fifth Circuit also explained that police are entitled only to "measured and ascending responses" to the actions of a suspect, "calibrated to physical and verbal resistance" shown by that suspect.[168] Most recently, in *Pratt v. Harris County, Texas*, the Fifth Circuit again endorsed the use of "measured and ascending action" when it considered an appeal from a district court's order granting summary judgment in favor of the defendants on qualified immunity.[169] In *Pratt*, the plaintiff ignored multiple requests and warnings from the officers, aggressively evaded attempts to apprehend him, and only after he continuously failed to comply did the officers deploy their tasers. The court found it "important that neither officer used their taser as the first method to gain Pratt's compliance. The record shows that both officers responded 'with measured and ascending actions that corresponded to [Pratt's] escalating verbal and physical resistance.'"[170]

---

immunity appropriate where, taking the facts in the light most favorable to the plaintiff, an officer making a minor traffic stop overpowered an individual who displayed, at most, passive resistance and presented no safety threat or flight risk).

[166] *Keele v. Leyva*, 69 F. App'x 659, 2003 WL 21356063 at *1 (5th Cir. May 30, 2003) (citing *Hudson v. McMillian,* 503 U.S. 1, 6–7 (1992)).

[167] 435 F. App'x 309, 311 (5th Cir. 2010).

[168] *Newman v. Guedry*, 703 F.3d at 767 (citing *Galvan,* 435 F. App'x. at 311).

[169] 822 F.3d 174 (5th Cir. 2016).

[170] *Id.* at 182 (quoting *Poole,* 691 F.3d at 629).

The Fifth Circuit has focused on the alternative methods, besides physical force, that are available to the officers when there is no active resistance to arrest. These are the measured and ascending actions that correspond to the escalating verbal and physical resistance described in *Galvan, Newman and Pratt*. Such alternative measure have come to be known as negotiation or de-escalation techniques.[171] De-escalation of conflict is not a new concept to police departments or to the courts. How and why police officers use force, and how and why citizens resist police, has been studied for many years. Recent instances of excessive uses of force, particularly against minorities, has intensified interest in the topic. In particular, the use of de-escalation techniques to stop ongoing conflict or to prevent it altogether, has gained attention. Former President Barack Obama's 2015 Task Force on 21st Century Policing suggested that, to address the problem of eroding citizen trust in law enforcement, law enforcement agencies implement better de-escalation training and policies and adopt de-escalation as an organizational philosophy.[172] The New Orleans Police Department requires that "when feasible based on the circumstances, officers will use de-escalation techniques, disengagement; area containment; surveillance; waiting out a suspect; summoning reinforcements; and/or calling in specialized units such as mental health and crisis resources, in order to reduce the need for force, and increase officer and civilian safety."[173] Many other police agencies, including the New York, Seattle, and Dallas police departments, have implemented de-

---

[171] Interestingly, Officer Morvant testified that he had received de-escalation training. R. Doc. 106-28 at 11-12. Officer Martin testified that he received training dealing with mentally ill people in field training officer school. R. Doc. 106-20 at 47-48. He also testified he was familiar with the concept of de-escalation and has used this tactic many times. R. Doc. 106-20 at 54-55.

[172] PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING (2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[173] NEW ORLEANS POLICE DEPARTMENT, OPERATIONS MANUAL, CHAPTER 1:3 USE OF FORCE, https://www.nola.gov/nopd/policies/.

escalation training.[174] In 2015, the Seattle Police Department adopted an official policy requiring that de-escalation tactics and techniques be used when safe and without compromising law enforcement priorities.[175] Seattle's police officers are required by policy to seek to minimize the likelihood of the need to use force by attempting to "slow down or stabilize the situation so that more time, options, and resources are available for incident resolution."[176] The authors of a 2017 study published in Police Quarterly analyzing police-citizen interactions found that, in fact, officers already routinely employ de-escalation tactics, explaining the ones commonly used are: the respect tactic, the calm tactic, the honesty tactic, the empathy tactic, the compromise tactic, the listening tactic, the reducing the power differential tactic, and the empowering tactic. [177]

By the date of this incident, it was clearly established law in the Fifth Circuit that police must have a measured and ascending response that corresponds to the resistance encountered, rather than immediately resorting to force every time they encounter any resistance. In this case, there are disputed issues of fact as to whether the Decedent was actively resisting arrest when Officers Martin and Costa initially took him to the ground or when they tased, kicked, and punched him. There also are disputed issues of fact as to whether and when Officers Martin and Costa became aware that the Decedent was mentally disturbed. These facts are crucial to a determination of whether Officers Martin and Costa's conduct was objectively reasonable in light of clearly established law. On summary judgment, the Court may not determine disputed facts in determining whether

---

[174] David Griffith, *De-Escalation Training: Learning to Back Off*, POLICE MAGAZINE, March 2, 2016, https://www.policemag.com/341981/de-escalation-training-learning-to-back-off.
[175] SEATTLE POLICE DEPARTMENT, SEATTLE POLICE DEPARTMENT MANUAL, 8.100 DE-ESCALATION, http://www.seattle.gov/police-manual/title-8---use-of-force/8100---de-escalation.
[176] *Id.*
[177] Natalie Todak & Lois James, *A Systematic Social Observation Study of Police De-Escalation Tactics*, 21(4) POLICE QUARTERLY 509, 516–17 (2018).

the offices' conduct was, or they reasonably believed it was, constitutional. Because there are material facts in dispute, the Court denies Defendants' motion for summary judgment with respect to the Fourth Amendment claims against Defendants Martin and Costa.

To be clear, the Court does not hold that Martin and Costa acted in an objectively unreasonable manner or whether they ultimately will be entitled to qualified immunity. Instead, the Court holds only that it cannot determine at the summary judgment stage, when the evidence must be viewed in the light most favorable to the Plaintiffs, whether Officers Martin and Costa acted in an objectively reasonable manner. At trial, the Plaintiffs must prove the issues the Court assumes in their favor and the jury may credit certain witnesses' testimony over others.[178] The witnesses may have their own differing recollections and perceptions of the events. "It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system."[179]

### C. Disputed Issues of Fact Also Preclude Summary Judgment on Claim for Failure to Intervene Against Officers Bartlett, Dugas, Faison, Leduff, Morvant, Rolland, and Thompson.

With respect to the Defendants Bartlett, Dugas, Faison, Leduff, Morvant, Rolland, and Thompson, the Plaintiffs contend they were present and observed the unconstitutional use of force but failed to intervene despite having the reasonable opportunity to do so.[180] To be found liable for their failure to intervene under § 1983, the Court must find the officers: (1) knew a fellow officer was violating an individual's constitutional rights; (2) was present at the scene of the constitutional violation; and (3) had a reasonable opportunity to prevent the harm; but nevertheless (4) chose not to act.[181]

---

[178] *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000).
[179] *Tolan F. Cotton*, 134 S.Ct. 1861 (2014).
[180] R. Doc. 53 at ¶¶ 6, 11, 16–23; R. Doc. 106.
[181] *Adams v. City of Shreveport*, 269 F. Supp. 3d 743, 758 (W.D. La. 2017) (citing *Whitley*, 726 F.3d at 646).

In support of their motion for summary judgment, the Defendants argue only that, because there was no violation of the Decedent's rights, there could be no claim for failure to intervene to prevent the harm.[182] The Court has determined that the Plaintiffs asserted a violation of Fourth Amendment rights against Officers Martin and Costa and that disputed issues of fact preclude summary judgment on the defense of qualified immunity. As a result, Officers Bartlett, Dugas, Faison, Leduff, Morvant, Rolland, and Thompson's motion for summary judgment that they are entitled to qualified immunity on the failure to intervene claim is denied.

## II. Defendants are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Claim.

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishment."[183] This prohibition is made applicable to the states through the Fourteenth Amendment.[184] The law is clearly established that prison officials inflict cruel and unusual punishment when they are deliberately indifferent to an inmate's serious medical needs.[185] A prison inmate may demonstrate an Eighth Amendment violation by showing that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[186] Because the Court finds this

---

[182] R. Doc. 72-18 at 35.
[183] U.S. CONST. amend. VIII.
[184] *See Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citing *Robinson v. California*, 370 U.S. 660, 666–67 (1962)).
[185] *Victoria W. v. Larpenter*, 369 F.3d 475, 483 (5th Cir. 2004).
[186] *Easter*, 467 F.3d at 465; *see also Estelle*, 429 U.S. at 104 ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." (internal quotation and citation omitted)); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) ("Since *Estelle v. Gamble*, state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.").

right is clearly established, the Court's analysis will focus on the issue of whether Defendants violated Plaintiff's clearly established Constitutional right.[187]

It is well-settled that "a state official's episodic act or omission violates a pretrial detainee's due process rights to medical care [and protection from harm] if the official acts with subjective deliberate indifference to the detainee's rights."[188] To demonstrate deliberate indifference, a plaintiff must present evidence: "(1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that the [defendant] subjectively intended that harm occur."[189] Deliberate indifference cannot be inferred merely from a negligent, or even a grossly negligent response to a substantial risk of serious harm.[190] "Deliberate indifference is an extremely high standard to meet."[191]

Plaintiffs contend Defendants acted with deliberate indifference when they left the Decedent unsupervised in the back of Officer Martin's squad car in a prone position, with his hands handcuffed behind his back and his legs shackled.[192] When handcuffs and leg restraints are connected with a "hog-tie loop," the method of restraint is referred to as hog-tying or a four-point restraint. It is important to note that, in this case, it is

---

[187] The parties dispute whether this right is clearly established. Defendants "assert that based on the jurisprudence and record, it is clearly established that their conduct did not violate any constitutional rights." R. Doc. 74-2 at 33. Plaintiff argues his right to constitutionally adequate medical care was clearly established. R. Doc. 86 at 17.

[188] *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000) (quoting *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996)).

[189] *Tamez v. Manthey*, 589 F.3d 764, 770, (5th Cir. 2009).

[190] *Estate of Allison v. Wansley*, 524 F. App'x 963, 970 (5th Cir. 2013) (citing *Hare v. City of Corinth*, 74 F.3d 633, 645, 649–50 (5th Cir.1996) (en banc) (citations omitted)).

[191] *Id.* (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

[192] In *Gutierrez v. City of San Antonio*, 139 F.3d 441, 451 (5th Cir. 1998), the plaintiff was handcuffed behind his back and placed in leg restraints with a "hog-tie loop" connecting his leg restraints to his handcuffs, referred to as "hog-tying." This method of restraint is also referred to herein as a "four-point restraint."

undisputed that the Decedent's handcuffs and leg restraints were not connected to each other. According to Plaintiffs, although the Decedent was bleeding and had been tased twice, the officers chose to leave him unsupervised in the car, in a position that obstructed his breathing and ultimately caused the Decedent to asphyxiate.

Defendants argue the scientific literature involving positional asphyxia has been largely disproven and that, therefore, even assuming the Decedent died from positional asphyxia, the officers could not have known that placing the Decedent in the vehicle in the prone position with his hands cuffed behind his back and his legs shackled posed a substantial risk of death.[193] In opposition, Plaintiffs argue "positional asphyxia has been accepted as a cause of death by every United States Court of Appeals in the country, including the Fifth Circuit,"[194] and that the officers in this case received training on the dangers of placing someone in a face down position in a police car.[195]

In support of their argument, Plaintiffs point to cases from the Fifth Circuit in which the plaintiff alleged the decedent died of asphyxiation as a result of being "hog-tied."[196] These cases hold only that hog-tying a detainee is not a *per se* constitutional violation. They do not support Plaintiffs' position in this case.[197] For example, in *Khan v. Normand*,[198] officers responded to reports of a man "running around inside a Winn–

---

[193] R. Doc. 72-18 at 38.
[194] R. Doc. 106 at 31.
[195] R. Doc. 106-41 at ¶ 134.
[196] The Court notes that in these cases, the Fifth Circuit considered whether placing a detainee in a four-point restraint constituted excessive force in violation of the Fourth Amendment.
[197] *Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012) (finding that officers' conduct in placing arrestee in a four-point restraint did not amount to excessive force); *Hill v. Carroll Cty.*, 587 F.3d 230, 235 (5th Cir. 2009) (explaining that, although the use of a four-point restraint in some cases might violate an arrestee's constitutional rights, it does not constitute a *per se* constitutional violation); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 451 (5th Cir. 1998) (reversing the district court's grant of summary judgment, but noting that the holding was "very limited," and stating that a four-point restraint may constitute excessive force in a only "limited set of circumstances").
[198] 683 F.3d 192.

Dixie store at closing time [who was] screaming that people outside were trying to kill him."[199] The officers apprehended the man and placed him in a four-point restraint. "Almost immediately [after placing him in the four-point restraint], the officers noticed [the man had] stopped breathing."[200] The officers removed the restraint and administered CPR. Although he "began to breathe again by the time he arrived at the hospital . . . he died later that night."[201] The district court granted summary judgment in favor of the officers, finding they were entitled to qualified immunity. The Fifth Circuit affirmed, stating the officers' use of the four-point restraint "did not violate a clearly established right."[202]

Similarly, in *Hill v. Carroll County*, police officers responded to a fight between two women.[203] After apprehending the women, the officers placed one of them, Loggins, in a four-point restraint, face-down in the squad car.[204] Once the officers arrived at the jail, they discovered Loggins was unresponsive with no pulse. She was soon pronounced dead.[205] The Fifth Circuit affirmed summary judgment, stating the plaintiff "failed to develop a material fact issue that the deputies' use of four-point restraints was unnecessary, excessively disproportionate to the resistance they faced, or objectively unreasonable in terms of its peril."[206]

In this case, the Decedent was not "hog-tied" or placed in a four-point restraint. Rather, the decedent was placed in handcuffs and leg shackles that were not connected to

---

[199] *Id.* at 193.
[200] *Id.*
[201] *Id.*
[202] *Id.* at 195.
[203] 587 F.3d at 232.
[204] *Id.* at 233.
[205] *Id.*
[206] *Id.* at 237.

each other. The Court notes that, although Plaintiffs assert the Decedent's legs were bent when the officers placed him in the squad car, they do not assert his legs were held in that position, nor do they assert the manner in which the Decedent was positioned in the car prevented him from straightening his legs in the way a four point restraint or "hog-tie" would. Thus, the issue in this case is whether: (1) the officers had subjective knowledge, i.e., that the Decedent's hands were handcuffed behind his back and his legs were in shackles and he was placed face-down in the back seat, from which an inference of substantial risk of serious harm could be drawn, (2) each Defendant actually drew that inference, and (3) Defendants subjectively intended for the Decedent to asphyxiate. Plaintiffs have not met their burden of presenting evidence to establish any of these three elements.

Even accepting the Plaintiffs' assertion that the Decedent was placed face-down in the squad car, the officers' placement of the Decedent amounts to negligence at worst. The Decedent was conscious when the officers placed him in the car, and he continued "screaming his name" and shouting the police were "trying to hurt him and kill him" while the officers placed him into the vehicle.[207] Other than offering evidence that Defendants received training on placing someone in a face-down position in a police car, Plaintiffs offer no evidence that the officers knew placing the Decedent face-down in the back-seat of the squad car presented a "significant risk" of asphyxiation, nor do they offer any evidence the officers intended for the Decedent to asphyxiate, other than to argue it can be inferred that Defendants intended to "punish" the Decedent.

---

[207] R. Doc. 106-41 at ¶ 124.

Even taking the facts in the light most favorable to the Plaintiffs, the Court is unable to conclude the officers' actions amounted to deliberate indifference.[208] Even assuming the officers should have known placing the Decedent face-down in the squad car posed a significant risk of harm, "the failure to alleviate a significant risk that [the officer] should have perceived, but did not[,] is insufficient to show deliberate indifference."[209] Thus, Plaintiffs have failed to bear their summary judgment burden of proving Defendants are not entitled to qualified immunity. As a result, Defendants' motion for summary judgment with respect to Plaintiffs' claim of violation of Decedent's Fourteenth Amendment rights is **GRANTED**.

## CONCLUSION

**IT IS ORDERED** that the motion for summary judgment filed by Defendants Damond Bartlett, Duston Costa, Shannon Dugas, Robert Faison, Brandon Leduff, Eddie Martin, Arthur Morvant, Julius Rolland, Thomas Thompson, and Stephen Verrett with respect to the Fourth Amendment claims against them be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendants James Price, Angelo Verisco, and Dustin Vinet with respect to the Fourth Amendment claims against them be and hereby is **GRANTED.**

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendants Damond Bartlett, Duston Costa, Shannon Dugas, Robert Faison, Brandon Leduff, Eddie Martin, Arthur Morvant, James Price, Julius Rolland, Thomas Thompson,

---

[208] To the extent Plaintiffs contend the way in which Defendants placed the Decedent in the squad car constitutes excessive force, the Court finds Defendants are entitled to qualified immunity. *See Khan*, 683 at 195; *Hill*, 587 F.3d at 235; *Gutierrez*, 139 F.3d at 451.
[209] *Domino*, 239 F.3d at 756 (citations omitted).

Angelo Varisco, Steven Verrett, and Dustin Vinet with respect to the Fourteenth Amendment claim against them be and hereby is **GRANTED**.

**New Orleans, Louisiana, this 3rd day of January 2019.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**