UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KATIE JOSEPH, ET AL.,** <br> **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO. 17-5051** |
| **JOHN DOE, ET AL.,** <br> **Defendants** | **SECTION: "E" (4)** |

### ORDER AND REASONS

Before the Court is Plaintiffs' Motion to Exclude the Testimony of Defendants' Expert Witness Dr. Tom Neuman.[1] Defendants oppose Plaintiffs' motion.[2] Plaintiffs filed a reply.[3] For the reasons that follow, Plaintiffs' motion is **DENIED**.

### FACTUAL BACKGROUND

The facts of this lawsuit have been outlined before, and this Court need not do so again.[4] Any specific facts that bear on the Court's resolution of this motion shall be discussed below. In short, there are four remaining claims in this lawsuit: (1) a Section 1983 excessive force claim against Officers Martin and Costa; (2) a state-law battery claim against Officers Martin and Costa; (3) a state-law wrongful death claim against Officers Martin, Costa, Varisco, Rolland, Verrett, Faison, Vinet, Dugas, Morvant, and Thompson; and (4) a state-law survival claim against Officers Martin, Costa, Varisco, Rolland, Verrett, Faison, Vinet, Dugas, Morvant, and Thompson.[5]

---

[1] R. Doc. 74.
[2] R. Doc. 86. Plaintiffs replied to Defendants' opposition at R. Doc. 97.
[3] R. Doc. 97.
[4] *Joseph on behalf of the Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020); *Joseph v. Doe*, Civ. A. No. 17-5051, 2019 WL 95467 (E.D. La. Jan. 3, 2019).
[5] There are no claims in this lawsuit against the City of Gretna under *Monell v. Department of Social Services of City of New York* in this lawsuit. Plaintiffs voluntarily dismissed their *Monell* claim on August 6, 2018. R. Doc. 69.

1

## **LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[6]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[7] provides the analytical framework for determining whether expert testimony is admissible under Rule 702.

Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[8] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[9]

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[10] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[11] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and

---

[6] FED. R. EVID. 702.
[7] 509 U.S. 579 (1993).
[8] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44, (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 592–93).
[9] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[10] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[11] 509 U.S. at 592–96.

publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[12]

The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[13] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant."[14] The district court is offered broad latitude in making expert testimony determinations.[15]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[16] "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[17] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[18] The Court is not concerned with whether the opinion is correct but whether the preponderance of the evidence establishes that the opinion is reliable.[19] "It is the role of the adversarial system, not the court, to highlight weak evidence."[20]

---

[12] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[13] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[14] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[15] *See, e.g., Kumho Tire*, 526 U.S. at 151–53.
[16] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[17] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[18] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[19] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[20] *Primrose*, 382 F.3d at 562.

## LAW AND ANALYSIS

**I.     The testimony of Defendants' expert, Dr. Tom Neuman, regarding asphyxia is reliable and relevant.**

Neuman is a semi-retired board-certified physician in internal medicine, pulmonary disease, occupational medicine, emergency medicine, and undersea and hyperbaric medicine.[21] He is trained in pulmonary medicine and exercise physiology and has, through direct experimentation, studied the physiological results of restraint positions and their effects on ventilation.[22] Neuman has been allowed to testify as an expert witness in a number of cases against police officers.[23]

After reviewing the evidence sent to him by Defense counsel, Neuman came to three overarching and primary opinions:

1.  Mr. Joseph did not die of asphyxia.

2.  Asphyxia did not contribute to Mr. Joseph's death.

3.  Mr. Joseph's death was due to a lethal arrhythmia in the setting of an agitated state (likely the excited delirium syndrome) with ongoing psychosis and evidence of diphenhydramine toxicity.[24]

The crux of the dispute is whether the Court should exclude the testimony of Defendant's expert, Neuman, as unreliable and scientifically irrelevant as it relates to asphyxia and positional restraint. Plaintiffs do not contest Neuman's qualifications as to pulmonary medicine and exercise physiology, but instead argue Neuman should not be allowed to opine as to whether asphyxia occurred in this case because the methodology

---

[21] R. Doc. 74-2 at pp. 1-2.
[22] R. Dod. 74-5 at 2.
[23] R. Doc. 74-4. E.g., *Pirolozzi v. Stanbro*, No. 5:07-CV-798, 2009 WL 1441070, at *5 (N.D. Ohio May 20, 2009).
[24] R. Doc. 74-5 at p. 8.

4

he relied upon in forming his opinion is flawed and will not be helpful to the jury in understanding the evidence or determining an issue of fact.[25]

Neuman relied in part on an earlier study he conducted on asphyxiation and positional restraint.[26] In 1994, an attorney representing police officers in a Section 1983 lawsuit hired Neuman to provide testimony to counter a pathologist's opinion that the plaintiff asphyxiated as a result of being hog-tied.[27] Neuman, disagreeing with a study by Dr. Donald T. Reay that concluded positional restraint and its effects should be considered when investigating death in persons who were handcuffed in the prone position,[28] decided to conduct his own study.[29] Plaintiffs describe Neuman's study as follows:

> In Neuman's Study, a group of healthy volunteers had a baseline pulmonary function test performed in the sitting, prone, and supine positions. The volunteers then exercised on a stationary bicycle and were again placed either in a standard sitting position, prone, or supine position for pulmonary function testing. Pulmonary function tests were repeated over a 15-month period and blood gas determinations were made. Based off their results, Neuman and his colleagues concluded that "body position by itself does not result in significant respiratory compromise", but also noted that oxygenation levels dropped in these individuals and that "further research [was] needed on the role of [. . .] other factors in the deaths of individuals placed in the restraint position."[30]

Neuman's study concluded, "There is no evidence to suggest that hypoventilatory respiratory failure or asphyxiation occurs as a direct result of body restraint position in

---

[25] R. Doc. 74-1 at 10.
[26] R. Doc. 74-5 at p. 2.
[27] *Price v. County of San Diego*, 990 F. Supp. 1230, 1237-38 (S.D. Cal. 1998).
[28] Reay later testified at his deposition in connection with the *Price* lawsuit that Neuman's study had essentially discredited his own study. R. Doc. 86-3 at pp. 3-7. None of the experts in this case intend to rely on Reay's study and no testimony will be allowed with respect to it.
[29] R. Doc. 74-6.
[30] R. Doc. 74-1 at p. 8 (citing R. Doc. 74-7 at p. 8).

healthy, awake, nonintoxicated individuals with normal cardiopulmonary function at baseline."[31]

Plaintiffs' expert, Dr. Michael M. Baden, will testify that "the cause of Mr. Joseph's death was positional asphyxia and rhabdomyolysis with renal failure and hyperkalemia, during police restraint."[32] Plaintiffs dispute Neuman's findings and argue Neuman's study and his conclusions are unreliable and irrelevant because Neuman failed to test or imitate field positions in his earlier study. In other words, they contend that "[i]t is simply not possible to test ventilation or breathing of a psychologically ill person involved in an exhaustive seven-minute life or death struggle with police officers who believes his life is in danger. Neuman's research cannot reproduce the extreme physiological changes, psychological stresses, struggle, and exhaustion of a prolonged real-life capture restraint situation."[33] Neuman later admitted that his study had numerous limitations, and he and his colleagues did not try to imitate "all conditions encountered in the field setting . . ."[34] Plaintiffs contend that because Neuman has not studied the precise situation in which Decedent found himself, Neuman's studies are unreliable and irrelevant.

Defendants contend that Plaintiffs have produced no experimental study or peer-reviewed article that discredits Neuman's testimony and report. Citing a book written by Dr. Elizabeth A. Laposata on which Plaintiffs rely, Defendants maintain that Laposata's book actually supports Neuman's testimony. Laposata writes, "When an in-custody death occurs, there is a close physical and temporal association between the restraint process and the death that follows. Because of this, it is tempting to attribute the cause of death

---

[31] R. Doc. 74-7 at pp. 8-9.
[32] R. Doc. 104-17 at p. 9.
[33] R. Doc. 74-1 at pp. 11-12.
[34] R. Doc. 74-7 at p. 8; R. Doc. 74-10 at p. 5.

to the restraint procedure itself. However, this is an error of logic . . ."[35] Moreover, Defendants note, the other texts on which Plaintiffs rely reveal that they themselves relied on the study of Reay, a now discredited study.[36]

Having reviewed the arguments and the supporting sources, the Court finds that Neuman's testimony is not unreliable or irrelevant. Neuman's testimony will assist the trier of fact to understand or to determine a fact in dispute between the parties.[37] As a board-certified physician in internal medicine, pulmonary disease, occupational medicine, and emergency medicine, he is qualified by knowledge, training and experience, and he and his colleagues conducted a study on the precise issue in dispute here: The correlation, if any, between positional restraint and asphyxiation, including the changes in static and dynamic pulmonary functions in various restraint positions, heart rate recovery, and oxygen saturation levels.[38] Neuman's study was peer-reviewed, even by Reay, who, as noted, testified at his deposition in the *Price* lawsuit that Neuman's study had essentially discredited his own.[39]

That Neuman did not imitate all real-life scenarios during his study – or even the specific scenario underlying this lawsuit – is of no moment. These are issues for cross-examination and will bear on the weight that the jury will potentially accredit to Neuman's testimony. Plaintiffs have their own expert, Baden, who will testify that he believes positional asphyxia contributed to Decedent's death,[40] and Defendants have Neuman, who will testify to his opinion based in part on the results obtained from his clinical study.

---

[35] R. Doc. 74-12 at p. 1.
[36] *Supra* n. 23.
[37] *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 591-92).
[38] R. Doc. 74-7 at pp. 4-6.
[39] *Supra* n. 23.
[40] R. Doc. 86-4 at p. 43.

7

And while Plaintiffs contend that Neuman's now semi-retired career is funded primarily by litigation, the Court notes that Neuman has published at least five follow-up articles on his clinical study, none of which appears to be funded by litigation.[41] This dispute is for a jury to resolve, *i.e.*, whether to weigh one expert's testimony more heavily than that of the other.[42] The Court will allow Neuman to testify as to his opinion on whether asphyxia caused or contributed to Decedent's death.

## II. Dr. Neuman may opine on Decedent's cause of death.

Plaintiffs also argue that, even if Neuman is allowed to testify that asphyxia and positional restraint *did not cause* Decedent's death, Neuman is "certainly not qualified to testify as to *what did cause* Joseph's death."[43] Citing numerous quotes from Neuman's deposition, Plaintiffs maintain Neuman should be allowed to testify only as to methodology, statistics, breathing, and pulmonology.[44] Plaintiffs point to Neuman's own testimony:

> I'm not a pathologist. Remember, I'm methodology, okay? I'm methodology, statistics, breathing. I'm not a pathologist. I can see the flaws in what a pathologist does based on methodology and statistics. I will not get into what the slides show. Unless we talk about slides of the lung because I'm a trained pulmonologist, and I can deal with that.[45]

---

[41] Sloan CM, Chan T, Kolkhorst F, Neuman, T, Castillo E, Vilke G., *Evaluation of the ventilatory effects of the prone maximum restraint (PMR) position on obese human subjects*, For. Sci. Intl. (2014); Savaser DJ, Campbell C, Castillo E, Vilke G, Sloan C, Neuman T, Hansen A, Shah V, Chan T., *The effect of the prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures*, J. For Legal Med. (2013); Michalewicz, B.A., Chan T, Vilke G, Levy S, Neuman T, and Kolkhorst F. *Ventilatory and metabolic demands during aggressive physical restraint in healthy adults*, J. of For Sci. (2007); Chan TC, Neuman TS, Clausen J, Eisele J, Vilke GM, *Weight force during prone restraint and respiratory function*, Am. J. Forensic Med. Pathol. (2004); Chan TC, Vilke G, Neuman T., *Reexamination of custody restraint position and positional asphyxia*, Am. J. Forensic Med. Pathol. (1998).

[42] *See, e.g., MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015) (finding no abuse of discretion after district court allowed two competing experts to testify as to their projected profit models at trial) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate.")).

[43] R. Doc. 74-1 at pp. 18-19.

[44] R. Doc. 74-3 at pp. 115, 130, 134-35.

[45] *Id.* at p. 135.

8

Plaintiffs argue Neuman should not be allowed to testify what caused Decedent's death because Neuman lacks the necessary experience in the field of forensic pathology, he has not practiced clinical medicine since 1998, and his curriculum vitae demonstrates his lack of experience and training in toxicology, pharmacology, and pathology.[46] *Daubert* does not support Plaintiffs position that testimony regarding the cause of death falls within the exclusive confines of pathology.[47] Neuman is board-certified in internal medicine, pulmonary disease, occupational medicine, emergency medicine, and undersea and hyperbaric medicine. He is qualified to testify as to whether the Decedent's death was caused by asphyxia or dysrhythmia and what factors caused his dysrhythmia.

The Plaintiffs also argue Neuman's testimony should be excluded because he changed his opinion regarding the Decedent's cause of death between his report and his deposition. At his deposition Neuman attributed Decedent's cardiac failure to a "stew" of factors, including excited delirium and/or psychosis, ingestion of Benadryl, renal failure, hyperkalemia, acidosis, and cardiac abnormalities including an enlarged heart.[48] In Neuman's report, he opined the cause of Decedent's death was not asphyxia but instead was "a lethal arrythmia in the setting of an agitated state (likely the excited delirium syndrome) with ongoing psychosis and evidence of diphenhydramine toxicity."[49]

Neuman did not change his opinion regarding the Decedent's cause of death; he opined in his report and testified at his deposition that the Decedent died of dysrhythmia.[50] Neuman testified at his deposition that a number of factors, psychosis,

---

[46] R. Doc. 74-2.
[47] *Carroll v. Morgan,* 17 F.3d 787 (5th Cir. 1994) (cardiologist allowed to give opinion on cause of death).
[48] R. Doc. 74-1 at p. 7.
[49] R. Doc. 74-5 at p. 8.
[50] R. Doc. 74-3 at p. 131.

9

renal failure, hyperkalemia, severe acidosis, and an enlarged heart all contributed to causing the dysrhythmia,[51] but he also mentioned most of these contributing factors in his report.[52] For example, Neuman mentioned in his report the Decedent was diagnosed with rhabdomyolysis. When asked at his deposition whether the Decedent had rhabdomyolysis, Neuman testified "probably to a small degree."[53] When asked whether the rhabdomyolysis was a factor in his death "at all," Neuman testified that it was "hard to say . . . . It may have been. I'm not saying it wasn't. There are just too many things going on with him that could have resulted in his dysrhythmia. To point at any one of them and say that's the key, that's what I have trouble with. There are just too many things."[54] The role of all of these factors in causing Decedent's death is discussed in Neuman's report or his deposition, or both.

Plaintiffs appear to object to admission of Neuman's opinions regarding the various causes of Decedent's dysrhythmia because some of the causes were first mentioned at his deposition and not explicitly mentioned in his report. Under Federal Rule of Civil Procedure 26(a)(2), expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." The rule also allows a party to "supplement these disclosures when required under Rule 26(e)."[55] Rule 26(e) requires parties to supplement disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other

---

[51] *Id.* at p. 157.
[52] R. Doc. 74-5 at pp. 4, 8.
[53] R. Doc. 74-3 at p. 129.
[54] *Id.* at p. 130.
[55] Fed. R. Civ. P. 26(a)(2)(E).

10

parties during the discovery process or in writing."[56] When an expert is "questioned on the recently obtained information at his deposition, the deposition functions much like a supplemental expert report, and may be said to 'expand' the scope of the formal expert report."[57] To the limited extent Newman further expanded or explained the causes of the Decedent's dysrhythmia at his deposition, this does not render his testimony inadmissible.

Neither does the fact that Neuman does not point to only one condition as causing Decedent's dysrhythmi disqualify him from testifying as to the cause of Decedent's death. The Court finds that Neuman is qualified by his training and experience to testify as to the Decedent's cause of death, both what did not cause it and what did cause it. His testimony is relevant and reliable. Any questions relating to the bases and sources of his opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact. The Court is confident that vigorous cross-examination will assist the jury in evaluating his testimony.

## CONCLUSION

**IT IS ORDERED** that Plaintiffs' Motion to Exclude Testimony of Dr. Tom Neuman is **DENIED**.

New Orleans, Louisiana, this 7th day of June, 2021.

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[56] Fed. R. Civ. P. 26(e)(1)(A).
[57] Shell Offshore v. ENI Petroleum, LLC, 2018 WL 1705527. (E.D. La. April 9, 2018).